FILED

2021 Mar-19  AM 09:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **STEPHEN MCKINNEY,** individually and derivatively on behalf of **PRIMUS ENTERPRISE, LLC,** | } } } } |
| **Plaintiff,** | } **Case No.: 2:19-cv-00503-ACA** } } |
| **v.** | } } |
| **THOMAS PINTER, et al.,** | } } |
| **Defendants.** | } } |

## <u>MEMORANDUM OPINION</u>

Before the court are the following motions for summary judgment: Defendants VetsUSA, II, Inc. ("VetsUSA"), and Stephen Worthington move for summary judgment on all of Plaintiff Stephen McKinney's claims against them (doc. 138); Defendants Thomas Pinter and Pinter Memorials, Inc. ("Pinter Memorials"), move for summary judgment on all of Mr. McKinney's claims against them (doc. 140); and Mr. McKinney moves for summary judgment or partial summary judgment on all of the counterclaims Mr. Pinter filed against him (doc. 139). Because these claims arise from the same operative facts, the court will address them together.

1

Mr. Pinter, Mr. McKinney, Mr. Worthington, and their respective companies engaged in a business relationship that soured. Initially, the parties worked together to produce and inscribe gravestones for the Department of Veteran Affairs ("VA"). Mr. Pinter and Mr. Worthington eventually stopped working with Mr. McKinney and continued producing inscribed gravestones without him. Mr. McKinney claims that Mr. Pinter and Mr. Worthington wrongfully cut him out of their gravestone operation. Mr. McKinney sued Mr. Pinter, Mr. Worthington and each of their respective companies, individually and derivatively on behalf of Primus Enterprise, LLC ("Primus"). Mr. Pinter filed a counterclaim. Now everyone has moved for summary judgment. (Docs. 138, 139, 140).

## I.    CASE SUMMARY

Mr. McKinney brings the following sixteen claims against Mr. Pinter, Mr. Worthington, and their respective companies, Pinter Memorials and VetsUSA:

(1)  breach of fiduciary duty, individually and derivatively on behalf of Primus, against Mr. Pinter ("Count One");

(2)  breach of operating agreement, individually, against Mr. Pinter ("Count Two");

(3)  tortious interference with existing and prospective contractual relationships, derivatively on behalf of Primus, against Mr. Pinter and Pinter Memorials;

(4)   tortious interference with existing contractual relationships, individually, against VetsUSA and Pinter Memorials;[1]

(5)   injunction, individually, against Mr. Pinter ("Count Five");

(6)   injunction, derivatively on behalf of Primus, against Mr. Pinter ("Count Six");

(7)   unjust enrichment, derivatively on behalf of Primus, against Mr. Pinter and Pinter Memorials ("Count Seven");

(8)   breach of contract, derivatively on behalf of Primus, against VetsUSA ("Count Eight");

(9)   breach of implied in fact contract, derivatively on behalf of Primus and brought alternatively to Count Eight, against VetsUSA ("Count Nine");

(10)   aiding and abetting breach of fiduciary duty, individually and derivatively on behalf of Primus, against Mr. Worthington ("Count Ten");

(11)   aiding and abetting breach of fiduciary duty, individually and derivatively on behalf of Primus, against VetsUSA ("Count Eleven");

(12)   aiding and abetting breach of fiduciary duty, individually and derivatively on behalf of Primus, against Mr. Pinter in his capacity as an officer of Pinter Memorials and against Pinter Memorials ("Count Twelve");

(13)   violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), individually and derivatively on behalf of Primus, against Mr. Pinter and Pinter Memorials ("Count Thirteen");

---

[1] Mr. McKinney initially brought counts three and four against Mr. Worthington as well (doc. 14 at 21), but the court dismissed these claims against Mr. Worthington (doc. 86 at 2).

(14) violation of the Defend Trade Secrets Act ("DTSA"), individually and derivatively on behalf of Primus, against Mr. Pinter and Pinter Memorials ("Count Fourteen");

(15) unfair competition, derivatively on behalf of Primus, against Mr. Worthington, VetsUSA, and Pinter Memorials ("Count Fifteen");

(16) breach of contract, individually, against Pinter Memorials ("Count Sixteen").

(Doc. 14 at 18–46).

Mr. Pinter asserts several counterclaims against Mr. McKinney, both individually and derivatively on behalf of Primus:

(1) breach of the fiduciary duty of loyalty and good faith, individually and derivatively on behalf of Primus ("Counterclaim One");

(2) breach of the fiduciary duty of care, individually and derivatively on behalf of Primus ("Counterclaim Two");

(3) breach of limited liability company agreement, individually ("Counterclaim Three");

(4) unjust enrichment, individually ("Counterclaim Four");

(5) fraudulent inducement and rescission, individually ("Counterclaim Five").

(Doc. 39 at 40–43).

For the reasons below, the court **WILL GRANT IN PART** and **DENY IN PART** Mr. Worthington and VetsUSA's motion for summary judgment. (Doc. 138). The court **WILL GRANT** summary judgment in favor of Mr. Worthington on Count Fifteen and **WILL ENTER SUMMARY JUDGMENT**

4

in favor of Mr. Worthington and against Mr. McKinney on that count.  The court **WILL DENY** Mr. Worthington's motion for summary judgment on Count Ten. The court **WILL DENY** VetsUSA's motion for summary judgment on Count Four, Count Eight, Count Nine, Count Eleven, and Count Fifteen.

Further, the court **WILL GRANT IN PART** and **DENY IN PART** Mr. Pinter and Pinter Memorials' motion for summary judgment. (Doc. 140).  The court **WILL GRANT** summary judgment in favor of Mr. Pinter on Count Twelve, Count Thirteen, and Count Fourteen and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Pinter and against Mr. McKinney on those counts. The court **WILL GRANT** summary judgment in favor of Pinter Memorials on Count Thirteen, Count Fourteen, and Count Sixteen and **WILL ENTER SUMMARY JUDGMENT** in favor of Pinter Memorials and against Mr. McKinney on those counts.   The court **WILL GRANT PARTIAL SUMMARY JUDGMENT** in favor of Mr. Pinter and Pinter Memorials on Count Seven and **WILL ENTER PARTIAL SUMMARY JUDGMENT** in their favor and against Mr. McKinney on that count.  The court **WILL DENY** Mr. Pinter's motion for summary judgment on Count One, Count Two, Count Three, Count Five, and Count Six.  The court **WILL DENY** Pinter Memorials' motion for summary judgment on Count Three, Count Four, Count Twelve, and Count Fifteen.

Finally, the court **WILL GRANT IN PART** and **DENY IN PART** Mr. McKinney's motion for partial summary judgment. (Doc. 139). The court **WILL GRANT** Mr. McKinney's motion for partial summary judgment on Counterclaim One and Counterclaim Two and **WILL ENTER PARTIAL SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on those counts. The court **WILL DENY** partial summary judgment on Counterclaim Three. The court **WILL GRANT** Mr. McKinney's motion for summary judgment on Counterclaim Four and Counterclaim Five and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on those counts.

## II.   BACKGROUND

VetsUSA is in the gravestone business. Mr. Worthington formed VetsUSA in December 2017 to produce inscribed gravestones for the VA. (Doc. 138-23 at 3, ¶ 6). In March 2018, VetsUSA secured a contract to provide inscribed gravestones to the VA. (Doc. 138-10 at 2). The contract ran for about six months, and the VA had the option to extend it for up to four, one-year terms. (*Id.*). The contract was valuable: if the VA exercised all four one-year options, the estimated value of the contract was $36,391,870. (*Id.*).

Mr. Worthington and VetsUSA did not operate on their own to secure the VA contract. Mr. Pinter had worked with Mr. Worthington in the past and suggested that he contact Mr. McKinney to discuss supplying VetsUSA with blank, inscribable

gravestones which VetsUSA would inscribe to satisfy its VA contract. (Doc. 138-1 at 25). This was the start of a brief and contentious business relationship between Mr. Worthington, Mr. Pinter, and Mr. McKinney.

### a. Mr. McKinney and Mr. Pinter Form Primus

To fulfill its VA contract, VetsUSA needed a supply of blank, inscribable gravestones, and Mr. Pinter and Mr. McKinney intended to provide them. (*Id.*). To do so, Mr. Pinter and Mr. McKinney formed Primus, a Delaware limited liability company. (Doc. 138-24 at 2). Mr. McKinney told Mr. Pinter that he had the financial ability and willingness to contribute fifty percent of the capital required to manufacture blank gravestones to sell to VetsUSA. (Doc. 138-3 at 72). Mr. Pinter also testified that neither party would "take any distribution until both of us were repaid our initial capital." (*Id.*). Although they discussed creating a written operating agreement for Primus, they never committed the agreement to writing. (Doc. 138-2 at 33; Doc. 138-3 at 70).

Instead, Messrs. Pinter and McKinney formed an oral operating agreement for Primus. (Doc. 138-3 at 70; Doc. 138-2 at 33). The terms of the operating agreement are in dispute. Mr. Pinter testified that the operating agreement contains the following provisions: (1) each party would contribute fifty percent of the capital required to operate Primus; (2) each party would contribute fifty percent of the work to manufacture gravestones, and (3) each party would treat Primus's employees with

respect and integrity.  (Doc. 138-3 at 70).  Mr. McKinney testified that the entire agreement consisted of a promise to contribute money equally and distribute money at the same time.  (Doc. 138-2 at 34).

Although Mr. Pinter testified that "one of the terms of the operating agreement would be that [we] would treat Primus's employees with respect and integrity," he acknowledged that the parties did not "discuss actually making that a written term in an operating agreement."  (Doc. 138-3 at 71).  He just assumed that "[a]nything that you talk about as a business and then attempt to implement is in effect part of an oral operating agreement."  (*Id.*).  Accordingly, the only provision that is undisputed is that the two men would contribute equal capital to Primus.  Neither party testified that they intended to modify or displace the default fiduciary duties imposed by Delaware law on limited liability companies and their members.  (Doc. 138-2 at 33–34; Doc. 138-3 at 70–71).

It is also disputed whether Mr. McKinney contributed the required fifty percent of the capital contributions to Primus.  Mr. McKinney made $64,105.29 in cash contributions while Mr. Pinter contributed $137,938.50.  (Doc. 140-8 at 13, 15).  But Mr. McKinney testified that his cash contributions were supplemented by a separate agreement between him and Mr. Pinter wherein Mr. McKinney's company, Wenzco Supplies LLC, would suspend the collection of debts owed to it by Pinter

Memorials until the two men took their first distribution from Primus.  (Doc 139-1 at 2).

### b.  VetsUSA's Agreement with Primus

Mr. Worthington intended to subcontract with Primus for blank gravestones. When the VA awarded VetsUSA the contract for inscribed gravestones, Mr. Worthington told Mr. McKinney on a phone call that "we are going to make a lot of money in this contract" and "this is going to be a very positive five years together."  (Doc. 138-2 at 9).  No one told Mr. Worthington the terms of Primus's operating agreement (doc. 138-1 at 28), but he knew that Mr. McKinney and Mr. Pinter were partners in that company.  (Doc. 138-6 at 27–28).

It is undisputed that Primus and VetsUSA intended to enter into a requirements contract in which VetsUSA would purchase all of the blank gravestones that it needed to fulfill the VA contract.  Whether the two companies ever actually entered a contract, however, is in dispute.

First, at the end of April 2018, Primus sent VetsUSA a written offer to contract.  (Doc. 138-11).  This document included a provision allowing Primus to terminate the contract if costs increased to a certain amount.  (*Id.* at 5 ¶ 3.1).  The document also stated that it "supersede[d] all prior to contemporaneous representations and agreements" and could "not be varied by any oral agreements or

representations or otherwise except by an instrument in writing . . . ." (*Id.* at 9 ¶ 8.1). It is undisputed that VetsUSA never executed this contract.

Two days later, VetsUSA sent a letter of intent to Primus. (Doc. 138-13). The letter of intent set out in definite terms the unit price of $210.00 per gravestone, an estimated quantity of 103,320 gravestones, an estimated value of $21,697,200 for Primus's services over the five-year contract term, and the quality and specific parameters of the gravestones. (Doc. 138-13 at 4; Doc. 14-5 at 3–4). However, it also contained a provision expressly providing that its terms were conditioned on the parties reaching a final written contract:

> This agreement is conditioned upon VetsUSA II and Primus reaching an agreement on terms (in addition to those above) of a Subcontract/Supplier Agreement and executing same, which the parties are currently negotiating.

(Doc. 138-13 at 4). Mr. Worthington testified that if the relationship continued, it had the potential to be worth up to "100 million [dollars] of future receivables." (Doc. 138-1 at 83).

Six days after VetsUSA sent the letter of intent, Primus requested from VetsUSA the formal agreement referenced in the letter. (Doc. 138-16 at 17). Two days later, VetsUSA responded and sent Primus a seventeen-page counteroffer to Primus's original proposal. (Doc. 138-15). This counteroffer contained a provision allowing VetsUSA to cancel the subcontract without cause. (*Id.* at 7, ¶ 21). Primus

10

did not agree to this provision, and two weeks later, sent a copy of its original offer to VetsUSA. (Doc. 138-16 at 5). VetsUSA responded by resending a copy of its counteroffer. (*Id.*). The parties never executed either of the proposed subcontract agreements.

While the parties negotiated the termination provision, Primus was producing blank gravestones for VetsUSA. (Doc. 138-4 at 132). Primus issued invoices charging VetsUSA two hundred and ten dollars for each blank gravestone, and VetsUSA paid the invoices. (Doc. 138-6 at 47). This relationship continued—with Primus producing blank gravestones and VetsUSA purchasing them at the price contemplated in the letter of intent—from late April 2018 until early August 2018. (*Id.* at 8–9).

c.  The JB Processing Facilities and Gravestone Fabrication

From April 2018 through August 2018, Primus operated out of a processing facility located in Bessemer, Alabama, and owned by JB Processing, LLC ("JB Processing"). (Doc. 138-2 at 7, 33, 103). VetsUSA also set up an office at the JB Processing facilities. (Doc. 138-6 at 30–31). JB Processing is owned by Chang Yan Tan, who lives in China and often communicated with Primus through his assistant, Wei Gao. (Doc. 140-5 at 4–5). Jacob Swindal is JB Processing's CEO. (*Id.* at 6).

JB Processing had experience manufacturing gravestones and allowed Primus to use its fabricating space and equipment. (Doc. 138-2 at 103). Although there was

no written agreement between Primus and JB Processing, Primus paid JB Processing for its use of the facility. (Doc. 139-4 at 2; Doc. 140-9 at 17). JB Processing had all of the equipment for manufacturing blank gravestones in place, but the degree to which the equipment was functional is in dispute: Mr. McKinney testified that "most of the equipment when we got there wasn't even running, so it had to be brought online" (doc. 138-2 at 58), while Mr. Pinter said that "all the equipment was there and set up and you had to just adjust the equipment to the headstone specs" (doc. 138-3 at 68).

Mr. McKinney testified that his responsibilities for Primus included determining the correct "[d]istance of blades, variables of amperage for pressure ratings on the equipment, the type of material used in some of the bits . . . , the flow of the operation in the sense of what steps went which direction, and the maintenance . . . in keeping the equipment operational." (*Id.* at 23). He says that he contributed "[p]rocedural work flow" to the fabrication process, that he was largely responsible for creating the process that Primus used to manufacture gravestones, and that his process was confidential. (Doc. 138-2 at 22). To that end, he testified that he told everyone at the worksite that Primus's fabrication process was confidential. (*Id.* at 24–25). He had no background or training in gravestone manufacturing, however, and did not consult any experts to determine whether his process for gravestone fabrication was unique. (*Id.* at 23).

d.  Mr. McKinney's Behavior

Some of Mr. McKinney's business associates objected to his behavior.  In an email to Mr. Gao, Mr. McKinney described his managements style: "I run everything with an iron fist.  Everyone may not like me, but they will respect me." (Doc. 140-14 at 5).   Others, like Mr. Swindal, saw his actions as more unprofessional: "there were several instances . . . between, you know, my employees with [Mr. McKinney], just lies, deceit, in some cases harassment."  (Doc. 140-5 at 8).   Mr. Worthington testified that "the negativity with [Mr. McKinney] was reported by [Mr. Pinter], by Stephanie [Worthington], and by [VetsUSA's site manager, Andrew Smith,] and it was all primarily related to personality and the way one handles people and the way one speaks to people."  (Doc. 138-1 at 16).

Mr. Smith testified that he had experiences with Mr. McKinney that he "considered to be disrespectful or unprofessional."  (Doc. 140-6 at 31).   And Mr. Pinter testified that Mr. McKinney "frequently" "abused, harassed, and bullied the individuals who worked at the JB Processing plant including employees of JB Processing, VetsUSA, and Primus."  (Doc. 138-3 at 87).  Mr. McKinney sent several text messages to Emily Catron, a JB Processing employee, in which he stated that he was "[r]eady to kick someone's ass" and told her that some movers working on

site had "five seconds to get the fuck out before [t]hey got to see my Ar-15 in action."
(Doc. 147-3 at 3).

Mr. Swindal was particularly disgruntled by Mr. McKinney's behavior.  He
testified that by August 2018, "the cumulative effect of [Mr. McKinney's] conduct
led [Mr. Swindal] to believe that [Mr. McKinney] had created a toxic environment."
(Doc. 140-5 at 70).   He also testified that Mr. McKinney's conduct was
"unpredictable."   (*Id.*).   According to Mr. Swindal, Mr. McKinney's actions
detrimentally affected most of the employees "physically, mentally, and in every
way possible."  (Doc. 140-5 at 72).

In short, although Mr. McKinney denies much of the accusations of rudeness
and inappropriate behavior, there was at least significant discord between the
workers at JB Processing and Mr. McKinney.

### e.  Mr. McKinney's Ban from JB Processing

In July 2018, Mr. McKinney made an offer to Mr. Tan, JB Processing's
owner, in which Mr. Tan would become an equal partner in Primus with
Messrs. McKinney and Pinter.  (Doc. 140-14 at 6).  Primus would then expand its
use of the JB Processing facilities and have authority over the quarry where it
obtained raw material for its gravestone production.  (*Id.* at 6–7).  As part of that
offer, Mr. McKinney made certain representations about the future of Primus,
including that Primus would "possess and be awarded over $185,000,000 in

14

contracts over the next three years," that the contract would "be renewed for another five year period," and that Mr. McKinney owned "several other entities that revolve around the stone industry. . . ." (*Id.* at 5). According to Mr. McKinney, Primus had "customers all over the world" and even without the government contracts, could "produce around $300,000 per day with at least 43% profit margin within the next 16 months." (Doc. 140-14 at 5). Further, as part of the deal, "Mr. Tan should expect over $2,500,000 in the year of 2020 and double that in 2021." (*Id.* at 7).

Mr. McKinney asserts that he was speaking on behalf of Primus in the email and says that the "other entities that revolve around the stone industry" was a reference, in part, to Pinter Memorials. (Doc. 138-2 at 78–79). He also wrote in the email that a thirty-three percent stake in Primus could be worth "over $600,000 of actual return investment" over the next twelve months. (Doc. 140-14 at 7). Mr. McKinney admits that some of the dollar amounts cited in his email were inaccurate but testified that he corrected that information when he met with Mr. Gao in person. (Doc. 138-2 at 78). He also said that "[a]t the time," he felt the information that he provided in the email "was very accurate." (*Id.*).

Mr. McKinney's offer was contingent on JB Processing making some staffing changes: Jacob Swindal, Emily Catron, and two other JB Processing employees "need[ed] to be removed from the operation." (Doc. 140-14 at 5). Mr. McKinney

wrote that for him to "turn[ ] this place around . . . , this would be a requirement." (*Id.* at 5).

A few days after he sent the email, Mr. McKinney met with Mr. Gao and Bintao Qin, another of Mr. Tan's agents, at the JB Processing facility.  (Doc. 138-3 at 12).  Mr. Pinter was also at the meeting; he testified that it was "impromptu" and that Mr. McKinney "had kind of been trying to take over the plant for months." (Doc. 138-3 at 7).  Mr. McKinney again suggested that JB Processing remove Mr. Swindal from the operation.  (*Id.* at 12).  During the meeting, Mr. Swindal texted Mr. Gao, "Are you with Steve??  What is going on?"  (Doc. 140-9 at 302).  He also called Mr. Gao five times—calls Mr. Gao declined—and sent several other text messages to Mr. Gao.  (*Id.* at 302–03).  He also sent a text message to both Mr. Gao and Mr. Qin that read "SOMEONE ANSWER!!"  (Doc. 138-4 at 96).

A few days later, Mr. Gao and Mr. Qin met with Mr. Swindal and shared Mr. McKinney's proposal and email with him, including the provision that Mr. Swindal be removed from his position with the company.  (Doc. 140-5 at 6). The level of interest that JB Processing and Mr. Tan initially had in Mr. McKinney's proposal is unclear, but it is undisputed that they never formed an agreement.  On August 9, 2018, Mr. Gao said that he had suggested Primus submit a written proposal.  (Doc. 140-9 at 312).  Two days later, Mr. Gao sent Mr. Swindal an email that stated, "As an investor, Mr. Tan wants to do business with capable and

16

trustworthy parties.  From what we know, [Mr. McKinney] is clearly not very credible."  (Doc. 140-16 at 2).

Mr. Swindal testified that by August 9, 2018, he had decided to bar Primus from the JB Processing facility because "to be productive with my company, JB[ ] Processing, it could not involve [Mr. McKinney] anymore."  (Doc. 140-5 at 12).  The same day, around noon, he told Mr. Pinter that "Primus's involvement at [the JB Processing] facility could no longer continue."  (*Id.* at 11).  Mr. Pinter understood this to mean both Mr. McKinney and Primus were going to be barred from JB Processing: "[Mr. Swindal] didn't want any businesses there that McKinney had ownership in.  He wanted McKinney out of his life."  (Doc. 138-3 at 20).

Mr. Pinter invited Mr. Swindal to his house that evening to further discuss his concerns with Mr. McKinney and Primus's future at the JB Processing plant.  (Doc. 138-3 at 16–18).  At 11:02 PM that night, after his meeting with Mr. Pinter, Mr. Swindal texted Mr. Gao and Mr. Qin: "I have a new plan!  I am talking to [Mr. Pinter] personally.  No talk with [Mr. McKinney] at this point.  WE NEED TO TALK ASAP.  [T]his could be very good."  (Doc. 138-4 at 96).  When asked what he meant by "a new plan," Mr. Swindal testified that he told Mr. Pinter that Primus could no longer continue at the plant and if Mr. Pinter continued his involvement with Primus, "then you're all—you're all gone."  (Doc. 140-5 at 10–11).

17

At 12:21 AM the following morning, Mr. Swindal also sent the following text message to Mr. Gao and Mr. Qin: "I trust [Mr. Pinter] and not [Mr. McKinney]. [Mr. Pinter] is prepared to step forward.  Let's talk 9:00am tomorrow morning." (Doc. 138-4 at 97).

The next day, at 6:38 AM, Mr. Gao sent Mr. Swindal an email in which he said, writing on behalf of Mr. Tan, that the "decision to get rid of [Mr. McKinney] is not up to us."  (*Id.* at 93).   He wrote that Mr. Tan had "no objections to [Mr. Pinter's] decision" as long as "the change ha[d] no major impact on fulfillment [of the] government project . . . ." (*Id.*)  The email gave Mr. Swindal permission to "assist [Mr. Pinter] to get rid of [Mr. McKinney]" but Mr. Tan did not want Mr. Swindal to "get involved in the decision-making process." (*Id.*)  He reiterated that the decision to ban Mr. McKinney was "not our decision, and we do not want [Mr. McKinney] to think [he is] out is because of us."  (Doc. 138-4 at 93). Mr. Swindal texted Mr. Gao that afternoon at 12:25 PM seeking assurance that "when [Mr. Pinter] and I tell him he is done and is no longer welcome that you will support the decision. . . .  [Mr. Pinter] and I have everything in place." (*Id.* at 100). Mr. Swindal continued, saying that even the "person in charge of [t]he contract" had agreed to "tell [Mr. McKinney] they will no longer work with him . . . ." (*Id.*).  At 12:41 PM, Mr. Pinter texted Mr. Swindal, "I have your back 100% and so will [Mr.] Worthington."  (Doc. 138-4 at 80).

To that end, Mr. Pinter called Mr. Worthington and "discussed the unfortunate situation and discussed moving forward." (Doc. 138-3 at 6). Mr. Pinter told Mr. Worthington that he was "going to try and keep operating" through "Pinter Memorials which [he] had still been operating and try and keep fulfilling the contract." (*Id.*). After his phone call with Mr. Worthington, Mr. Pinter helped Mr. Swindal draft an email to Mr. McKinney informing him of his upcoming expulsion from JB Processing. (Doc. 138-5 at 53). After sending the final version to Mr. Swindal, Mr. Pinter wrote that "[t]he only way [Mr.] Worthington wants to move forward with [JB] Processing is if [Mr.] McKinney is banned from the property. All past due invoices and utilities will be paid immediately upon the ban." (Doc. 138-4 at 82).

The next day, at 11:05 AM, Stephanie Worthington asked Mr. Pinter whether she could call the VA to tell them about the status of their subcontract, and Mr. Pinter told her to wait. (Doc. 138-6 at 4–5). At 12:48 PM, Mr. Pinter sent an email to Mr. McKinney, with a copy to Mr. Swindal, purporting to end their business relationship because they did not "share the same values and views on how the company should be run" and because of the "events that have transpired." (Doc. 138-4 at 116). At 12:58 PM, Mr. Swindal sent the email that he had prepared with Mr. Pinter to Mr. McKinney. (Doc. 140-5 at 168). The email "officially inform[ed]" Mr. McKinney that he "will no longer be allowed to work on the

premises of JB Processing" and he was "no longer lawfully permitted at the plant property for any reason." (*Id.*).

    f.  The VetsUSA and Pinter Memorials Agreement

Mr. McKinney testified that after his ban from JB Processing, he was willing to move Primus's operation to a different facility and suggested as much to Mr. Pinter. (Doc. 138-2 at 103). Primus never resumed operations, however, and VetsUSA began purchasing blank gravestones from Pinter Memorials. (Doc. 138-6 at 7–8).

Four days after Mr. McKinney's ban from JB Processing, Mr. Pinter traveled to Vermont to purchase marble to manufacture gravestones. (Doc. 149-2 at 33). The same day, he texted Ms. Worthington that he "ordered a lot of really nice marble today." (*Id.* at 32). From August 17, 2018, to August 21, 2018, Pinter Memorials paid over $100,000 for marble from Vermont Quarries. (*Id.*).

Six days after Mr. McKinney's ban, Mr. Pinter sent Mr. McKinney an email detailing his plans to continue providing VetsUSA with blank gravestones. (Doc. 138-20 at 2). Six days after that, Mr. Pinter sent an email to Mr. Worthington describing Mr. McKinney's ban from JB Processing and how his "relationship with [Mr. McKinney] in Primus was no longer tenable." (*Id.* at 4). Of course, Mr. Pinter had already told Mr. Worthington on August 11, 2018, that he intended to keep supplying gravestones through Pinter Memorials after Primus halted production.

(Doc. 138-3 at 6). Pinter Memorials and VetsUSA's arrangement was similar to the arrangement between Primus and VetsUSA. Although there was a discussion between the two companies that Pinter Memorials would inscribe some of the stones and enter a fee-splitting arrangement with VetsUSA, VetsUSA decided to engrave the stones itself. (Doc. 138-6 at 15). With Primus and Mr. McKinney out of the picture, the gravestone operation continued.

g. Mr. McKinney's Lawsuit

Alleging a variety of claims, Mr. McKinney brought this suit, both individually and derivatively on behalf of Primus, against Mr. Pinter, Pinter Memorials, Mr. Worthington, and VetsUSA. (Doc. 14). In his answer, Mr. Pinter asserted five counterclaims against Mr. McKinney, both individually and derivatively on behalf of Primus. (Doc. 39). VetsUSA and Mr. Worthington moved to dismiss the claims against them (doc. 64 at 1), and the court granted the motion in part and denied in part (doc. 86 at 2). The court dismissed Count Three and Count Four as to Mr. Worthington but let Mr. McKinney proceed on his other counts. (*Id.*). Next, VetsUSA and Mr. Worthington moved for summary judgment on all counts against them (doc. 138), Mr. Pinter and Pinter memorials did the same (doc. 140,

and Mr. McKinney moved for partial summary judgment on Mr. Pinter's counterclaims (doc. 139).  These motions are now before the court.

## III.   DISCUSSION

In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Under Rule 56, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."  *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).  A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### a.  Count One: Breach of Fiduciary Duty

In Count One, Mr. McKinney, individually and derivatively on behalf of Primus, alleges that Mr. Pinter breached his fiduciary duties of loyalty and good faith by, among other things, "diverting existing and prospective business opportunities [and] competing with Primus."  (Doc. 14 at 18).  "To bring a claim for breach of fiduciary duty, a plaintiff must establish (1) that a fiduciary duty existed and (2) that the defendant breached that duty."  *Bamford v. Penfold, L.P.*, C.A. No 2019-0005-

JTL, 2020 WL 967942, at *18 (Del. Ch. Feb. 28, 2020) (internal citations and quotation marks omitted).  Mr. Pinter argues that Count One fails for three reasons: he did not owe a fiduciary duty to Primus; Mr. McKinney's conduct excuses any misconduct by Mr. Pinter under the doctrine of unclean hands; and it was impossible for Primus to provide VetsUSA with gravestones, and thus it was not a breach of the duty of loyalty for Mr. Pinter to do so on behalf of Pinter Memorials.  (Doc. 143 at 22–26).  None of these arguments will sustain summary judgment on Count One.

First, Mr. Pinter argues that he did not owe the traditional fiduciary duties to Primus or Mr. McKinney because the parties "expressly recognized that there were no [fiduciary] duties" in the operating agreement.  (Doc. 143 at 23). As a default rule . . . members of LLCs owe traditional fiduciary duties of loyalty and care." *2009 Caiola Family Tr. v. PWA, LLC*, No. CV 8028-VCP, 2014 WL 7232276, at *8 (Del. Ch. Dec. 18, 2014).  An LLC may "'displace fiduciary duties altogether or tailor their application' by terms of its operating agreement."  *Id.* (quoting *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 856 (Del. Ch. 2012)).  But "[w]here the agreement is silent with respect to fiduciary duties, Delaware law imposes default fiduciary duties on managers of an LLC."  *Kyle v. Apollomax, LLC*, 987 F. Supp. 2d 519, 524 (D. Del. 2013).

Here, both parties agree that the operating agreement is silent on the existence of fiduciary duties.  (Doc. 143 at 22–23).  Mr. Pinter argues that this silence amounts

to a "recognition that there were no other expectations between [Mr. Pinter and Mr. McKinney]." (*Id.* at 23). But Delaware law is clear: where the operating agreement is silent with respect to fiduciary duties, as it is here, the parties are bound by the default duties of loyalty and care. Accordingly, Mr. Pinter's first argument fails as a matter of law.

His second argument is also without merit. Mr. Pinter argues that even if he did breach his fiduciary duties, Mr. McKinney should be estopped from bringing this claim because of the doctrine of unclean hands. The doctrine of unclean hands is an equitable defense and thus applies only when a party seeks an equitable remedy. *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 875 (Del. 2015); *see also USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 20 (Del. Super. Ct. 2000) ("The defense of 'unclean hands' is generally inappropriate for legal remedies."). In Count One, Mr. McKinney seeks a monetary award, not an equitable remedy. (Doc. 14 at 18–19). Accordingly, Mr. Pinter's second argument fails.

Mr. Pinter's third argument is a closer question, but also fails to satisfy the summary judgment standard. Mr. Pinter argues that it was impossible for Primus to take advantage of the VetsUSA contract, and it was therefore not a breach of his fiduciary duty to sell gravestones to VetsUSA. (Doc. 143 at 25). Under the corporate opportunity doctrine, it is a breach of the duty of loyalty for a corporate officer or director to take a business opportunity for his own if: "(1) the corporation

24

is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity;" and (4) taking the opportunity will place the fiduciary in a hostile position to the company. *Broz v. Cellular Information Systems, Inc.*, 673 A.2d 148, 155 (Del. 1996).

Here, Mr. Pinter attacks the first and third elements, arguing that the evidence shows "[Mr.] McKinney had destroyed any chance Primus had of exploiting the business opportunity" because he was banned from JB Processing. (Doc. 143 at 25). Thus, according to Mr. Pinter, it was "impossible for Primus to perform any possible future agreement." (*Id.*) Viewing the evidence in the light most favorable to Mr. McKinney, however, a reasonable jury could find that Mr. Pinter caused JB Processing to ban Mr. McKinney and usurped Primus's business opportunity. Mr. Pinter points to Primus's failed relationship with JB Processing as undisputed proof that Primus could no longer fulfill the VetsUSA contract. Mr. McKinney responds by arguing that the breach occurred before JB Processing banned Mr. McKinney from the premises and was "orchestrated" by Mr. Pinter. (Doc. 150 at 27).

The day before JB Processing banned Mr. McKinney, Mr. Tan wrote that "[t]he decision to get rid of [Mr. McKinney] is not up to us. We have no objections to [Mr. Pinter's] decision if he is certain the change has no major impact on

25

fulfillment [of the] government project."  (Doc. 138-4 at 93).  Further, Mr. Pinter met with Mr. Swindal to discuss Mr. McKinney and Primus's future at the JB Processing plant (doc. 138-3 at 16–18), and Mr. Swindal left that meeting with "a new plan" and told his business associates that Mr. Pinter was "prepared to step forward" (doc. 138-4 at 96–97).  Mr. Pinter also texted Mr. Swindal that he "ha[d] [his] back 100% and so will [Mr.] Worthington."  (Doc. 138-4 at 80).  Mr. Pinter told Mr. Worthington that he was "going to try and keep operating" through Pinter Memorials and was going to "try and keep fulfilling the contract."  (Doc. 138-3 at 6).  He even helped Mr. Swindal draft the email banning Mr. McKinney from JB Processing.  (Doc. 138-5 at 53).  Finally, Mr. Pinter told Mr. Swindal the morning before Mr. McKinney was banned that "you will never have to speak to him again. I'll deal with [Mr. McKinney]."  (Doc. 138-4 at 83).

It remains a question of fact whether Mr. Pinter caused Mr. McKinney's ouster and whether he breached the duty of loyalty.  But viewing the evidence in favor of the nonmovant, a reasonable jury could conclude that he did.  Thus, the court **WILL DENY** Mr. Pinter's motion for summary judgment on Count One.

b.  Count Two: Breach of Operating Agreement

In Count Two, Mr. McKinney alleges that Mr. Pinter breached Primus's operating agreement.  (Doc. 14 at 19).  Mr. Pinter argues that his obligations under the operating agreement are excused because Mr. McKinney breached the

26

agreement first. (Doc. 143 at 27–28). Mr. McKinney argues that Mr. Pinter has waived that argument by failing to plead it as an affirmative defense in his answer. (Doc. 150 at 28–29). Under both Pennsylvania and Delaware law,[2] "[a] party is excused from performance under a contract if the other party is in material breach thereof." *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003); *see also LJL Trasp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 648 (Pa. 2009) (holding that a party that has materially breached a contract may not insist upon performance of the contract).

Mr. Pinter argues that he was excused from performance because Mr. McKinney's breaches were "legion and material." (Doc. 143 at 28). Viewing the evidence in the light most favorable to Mr. McKinney, however, a reasonable jury could find that Mr. McKinney was not in breach of the operating agreement. First, Mr. Pinter argues that Mr. McKinney "failed to contribute 50% of the capital" to Primus. (*Id.*). Mr. McKinney testified that "in lieu of me fronting the 50% of the capital directly to Primus, my separate company . . . would postpone the collection of debts owed to it by Pinter Memorials." (Doc. 139-1 at 2). This creates a genuine issue of material fact as to whether Mr. McKinney met his capital contribution obligation.

---

[2] The parties analyze this issue under both Pennsylvania and Delaware law, (doc. 143 at 27–28; doc. 150 at 28–29), and there does not appear to be a conflict of law on this issue.

Next, Mr. Pinter points to the agreement that the partners share equally in the work and argues that when Mr. McKinney "was banned from the facility, it was impossible for him to equally share in the work of Primus." (Doc. 143 at 28). Mr. McKinney, however, testified that he was willing to move Primus's operation to a different facility and continue operation. (Doc. 138-2 at 103). Viewing this evidence in the light most favorable to the non-moving party, a reasonable jury could find that Mr. McKinney was still able and willing to contribute fifty percent of the work of Primus.

Finally, Mr. Pinter argues that Mr. McKinney "was a bully and created a toxic work environment," which breached the operating agreement term to "treat employees with integrity and respect." (Doc. 143 at 28). Whether Primus's operating agreement included the integrity and respect provision, however, is in dispute. Mr. Pinter testified that "one of the terms of the operating agreement would be that [we] would treat Primus's employees with respect and integrity." (Doc. 138-3 at 71). He also acknowledged that the parties did not "discuss actually making that a written term in an operating agreement," he just assumed that "[a]nything that you talk about as a business and then attempt to implement is in effect part of an oral operating agreement." (*Id.*).

Mr. McKinney testified that the terms of the operating agreement were "that we were 50/50 partners, that we would take distributions equally at the same time

for the same amounts, and that we would contribute equally." (Doc. 138-2 at 33–34). When asked if the operating agreement included any other terms, Mr. McKinney said no. (*Id.* at 34, 4–15). In short, it is an issue of fact whether "treat[ing] Primus's employees with respect and integrity" was a term of the operating agreement, and if it was, whether Mr. McKinney breached that provision. (Doc. 138-3 at 71).

Because there is a genuine dispute as to whether Mr. McKinney breached the contract, Mr. Pinter's arguments that his performance under the operating agreement was impossible and that his alleged breach is excused fail. Accordingly, the court **WILL DENY** Mr. Pinter's motion for summary judgment on Count Two.

### c. Counts Three and Four: Tortious Interference

In Counts Three and Four Mr. McKinney brings claims for tortious interference with a contract or prospective contract against VetsUSA, Mr. Pinter, and Pinter Memorials. (Doc. 14 at 21–27). To establish a cause of action for intentional or tortious interference with an existing or prospective contractual relationship, the plaintiff must show: (1) a contract or prospective contract between the plaintiff and a third party; (2) action by the defendant intended to harm the contract or prospective contract; (3) the absence of privilege or justification on the part of the defendant; and (4) damages resulting from the defendant's conduct. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Sup. Ct. 1997).[3]   A

---

[3] It is undisputed that Pennsylvania law applies to the tortious interference counts.

prospective business relationship is one that is reasonably probable to occur. *Glenn v. Point Park College*, 272 A.2d 895, 898–99 (Pa. 1971). To satisfy the second element, a plaintiff must show that the "defendant's conduct [was not] sanctioned by the rules of the game which society has adopted." *Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008).

### a. *Count Three: Tortious Interference with the VetsUSA Contract*

In Count Three, Mr. McKinney brings a tortious interference claim, derivatively on behalf of Primus, against Mr. Pinter and Pinter Memorials (together "the Pinter Defendants").[4] (Doc. 14 at 21–26). Mr. McKinney alleges that the Pinter Defendants interfered with a contract between VetsUSA and Primus to produce blank gravestones and with a prospective contractual relationship to do the same. (*Id.* at 21–26).

The Pinter Defendants make four arguments for summary judgment: first, that they are not third parties to the contract and thus cannot be liable for interfering with the contract; second, that there was no contract between VetsUSA and Primus with which they could interfere; third, that there was no prospective business relationship between VetsUSA and Primus with which they could interfere; and fourth, that Mr. Pinter's actions were proper and privileged, shielding the Pinter Defendants

---

[4] The court dismissed this claim against Mr. Worthington because he was operating within his role as an officer of VetsUSA. (Doc. 86 at 10).

from liability. (Doc. 143 at 29–34).

The Pinter Defendants' first argument fails because there is evidence that Mr. Pinter was acting outside of the scope of his authority as an agent of Primus. There can be no action for contractual interference where the "contract is terminated by a corporate agent who has acted within the scope of his or her authority [because] the corporation and its agent are considered one." *Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1002 (Pa. Super. Ct. 1987). Thus, where the contract is terminated by a corporate agent, "there is no third party against whom a claim for contractual interference will lie." *Id.* This rule, however, does not extend to "acts committed by an agent outside the scope of employment or agency." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 173 (3d Cir. 2001). So, to avoid summary judgment on this issue, a plaintiff must point to "evidence from which a reasonable fact finder could conclude that [the defendant] acted in his personal capacity or outside the scope of his authority" when he interfered with the contract. *Kia v. Imaging Scis. Int'l, Inc.*, 735 F. Supp. 2d 256, 268 (E.D. Pa. 2010).

Conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Spitsin v. WGM Transp., Inc.*, 97 A.3d 774, 776 (Pa. Super. Ct. 2014) (quoting *Fitzgerald v. McCutcheon*, 270 Pa.Super. 102, 410

A.2d 1270, 1271–72 (1979)).   "Whether a person acted within the scope of employment is ordinarily a question for the jury."  *Id.*

Here, Mr. McKinney points to evidence that Mr. Pinter "secretly orchestrat[ed] Mr. McKinney's ouster" and was thus acting outside the scope of his authority as an officer of Primus.  (Doc. 150 at 30).  Much of the evidence surrounding Mr. McKinney's ouster from JB Processing and Primus's split with VetsUSA is disputed.  But there is evidence that Mr. Pinter either acquiesced to or actively encouraged Mr. McKinney's ban: he met with Mr. Swindal to discuss banning Mr. McKinney (doc. 138-3 at 16–18), he helped draft the email banning Mr. McKinney (doc. 138-5 at 53), and he told Mr. Swindal he "ha[d] his back 100% . . . ." (doc. 138-4 at 80).  Considering this evidence, a reasonable fact finder could conclude that Mr. Pinter was acting outside the scope of his authority and that he interfered with the Primus's relationship with VetsUSA.

The Pinter Defendants second and third arguments also fail.  As discussed in Count Eight, *infra*, there is enough evidence for a reasonable jury to conclude that there was an enforceable contract between VetsUSA and Primus for the production of blank gravestones.  Further, a claim for tortious interference can rest on alleged interference with a prospective relationship.  *Strickland*, 700 A.2d at 985.  Even if VetsUSA and Primus did not have an enforceable contract, it is undisputed that they were at least in contract discussions.  (Doc. 138-15; Doc. 138-16).  Without

Mr. Pinter's interference, there is enough evidence for a jury to find that it was reasonably probable that Primus and VetsUSA would reach an agreement. Thus, it is a question for the jury whether the Pinter Defendants interfered with a prospective business relationship between Primus and VetsUSA.

Finally, there is evidence that Mr. Pinter's actions were improper. The Pinter Defendants argue that Mr. Pinter's actions were part of the "rules of the game which society has adopted." (Doc. 143 at 34 (citing *Salsgiver Communs, Inc. v. Consol. Communs. Holdings*, 150 A.3d 957, 968 (Pa. Super. 2016) (quotations omitted)). When viewed in the light most favorable to Mr. McKinney, however, the evidence supports a finding that Mr. Pinter's actions fell well outside of those rules. As addressed in part b., *supra*, a reasonable jury could find that Mr. Pinter breached his duty of loyalty to Primus and Mr. McKinney. Failing to adhere to the fiduciary duty of loyalty falls outside of the rules of the game. Accordingly, the court **WILL DENY** summary judgment on Count Three.

### b.  *Count Four: Tortious Interference with the Operating Agreement*

In Count Four, Mr. McKinney brings a tortious interference claim against VetsUSA and Pinter Memorials for interfering with Primus's operating agreement. (Doc. 14 at 26–27).[5]  VetsUSA moves for summary judgment on this count, arguing

---

[5] The court dismissed this claim against Mr. Worthington because he was operating within his role as an officer of VetsUSA.  (Doc. 86 at 10).

that it was justified in purchasing gravestones from Pinter Memorials after Primus stopped supplying them to VetsUSA.  (Doc. 141 at 28–29).  To VetsUSA, it was within its rights "to work with whomever it chooses and to express that sentiment if asked."  (Doc. 154 at 8).

But what Mr. McKinney alleges, and what the evidence supports, is that VetsUSA's refusal to work with him led to his split with Mr. Pinter, which caused Primus to stop producing gravestones.  (Doc. 138-2 at 26).  There is evidence that VetsUSA knew that Pinter Memorials planned to provide it with gravestones for the VA contract after Mr. Pinter left Primus (doc. 138-3 at 6), and that Mr. Worthington encouraged Mr. Pinter to break with Mr. McKinney (doc. 138-4 at 82).  From the evidence here, a reasonable jury could find that VetsUSA substantially assisted and encouraged Mr. Pinter's breach.  Accordingly, the court **WILL DENY** VetsUSA's motion for summary judgment on Count Three.

Pinter Memorials also moves for summary judgment on this count, arguing that it cannot be liable for tortious interference because it can only act through its officer, Mr. Pinter, who was a party to the oral operating agreement.  (Doc. 143 at 30).  To the extent that Mr. Pinter was operating as an agent of Pinter Memorials, however, he was acting as a third party.  It is "settled Pennsylvania law that corporations act only through its officers and agents . . . ."  *Michelson v. Exxon Research and Eng'g Co.*, 808 F.2d 1005, 1007–08 (3d Cir. 1987) (citation omitted).

And when an officer acts within his authority, "the corporation and its agent are considered one." *Daniel Adams Assocs., Inc.*, 519 A.2d at 1002.

Pinter Memorials was not a party to the operating agreement. And Pinter Memorials offers no authority for the proposition that a company is shielded from tortious interference liability because its officer is privy to a contract in his individual capacity. Although Pinter Memorials can only act through its officers, it is not a party to every contract that its officers enter. Thus, an action by Pinter Memorials specifically intended to harm an existing contract between Mr. Pinter and Mr. McKinney can give rise to a tortious interference claim, even if those actions were taken by Mr. Pinter himself.

Pinter Memorials has not cited any authority suggesting that a company is immune from a tortious interference claim because its officer is a party to the contract at issue. Where a party enters into a "contract with a corporation, and that contract is terminated by a corporate agent who has acted within the scope of his or her authority, . . . there is no third party against whom a claim for contractual interference will lie." *Daniel Adams Assocs., Inc.*, 519 A.2d at 1002. It stands to reason, then, that when a party enters into a contract with a person in their individual capacity, the company he represents in his official capacity remains a third-party capable of tortious interference. Accordingly, the court **WILL DENY** summary judgment for Pinter Memorials on Count Four.

d.  Count Six: Permanent Injunction

In Count Six, Mr. McKinney seeks a permanent injunction against Mr. Pinter derivatively on behalf of Primus.  Mr. Pinter moves for summary judgment on this count, arguing that because Mr. McKinney cannot prevail on the merits of his claim "he is not entitled to an injunction."  (Doc. 14 at 29).  "The standard for a permanent injunction is . . . that the plaintiff must show actual success on the merits . . . ."  *Klay v. United Healthgroun, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004).  Because Mr. McKinney will have the opportunity to succeed on the merits at trial, the court **WILL DENY** summary judgment on Count Six.[6]

e.  Count Seven: Unjust Enrichment

The Pinter Defendants move for summary judgment on Count Seven, Mr. McKinney's claim for unjust enrichment.  (Doc. 143 at 35).  Mr. McKinney brings this claim derivatively on behalf of Primus.  (Doc. 14 at 29–31).  A party is "unjustly enriched if his retention of a benefit would be unjust."  *Welch v. Montgomery Eye Physicians, P.C.*, 891 So.2d 837, 843 (Ala. 2004)[7] (quotation marks omitted).  "In the absence of . . . wrongful conduct by the recipient, the

---

[6] In Count Five, Mr. McKinney individually seeks a permanent injunction against Mr. Pinter.  (Doc. 14 at 28).  Mr. Pinter's motion only references Count VI but broadly states that Mr. McKinney "is not entitled to an injunction."  (Doc. 143 at 44).  To the extent that Mr. Pinter moves for summary judgment on Count Five, the court **WILL DENY** summary judgment on Count Five for the same reasons as Count Six.

[7] The parties agree that Alabama law applies to Mr. McKinney's unjust enrichment claim.

recipient may have been enriched, but he is not deemed to have been unjustly enriched." *Id.*

The Pinter Defendants argue that "nothing that happened with Primus was unjust to McKinney, and Pinter received no unjust benefit."[8] (Doc. 143 at 35). They also argue that an unjust enrichment claim, an equitable remedy, is not available if Mr. McKinney bases his claim on a breach of either the operating agreement or a contract between VetsUSA and Primus. (*Id.*). First, Mr. McKinney brings this claim derivatively on behalf of Primus, not individually, so it is irrelevant to this claim whether anything that happened was unjust to him personally. (Doc. 14 at 29).

Second, Mr. McKinney, on behalf of Primus, is pursuing alternate theories of liability against the Pinter Defendants. (Doc. 150 at 34). A jury may find that no contract existed between VetsUSA and Primus. The law allows a plaintiff to proceed on an equitable claim when the existence of a contract is disputed, as it is here. *See Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996) (holding that the trial court properly submitted both implied and express contract theories to the jury where the existence of an express contract was in dispute). Thus,

---

[8] The Pinter Defendants also argue that Mr. McKinney is barred by the doctrine of unclean hands, but they do not develop this argument and have thus waived it. *See Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments . . . .").

summary judgment is inappropriate on this count to the extent it is based on the relationship between VetsUSA and Primus.

However, an alternative claim for unjust enrichment is only available when the *existence* of the contract is disputed. *Kennedy*, 682 So. 2d at 447. Where only the terms of the contract are in dispute, the court will not allow an unjust enrichment claim to proceed. *Id.* It is undisputed that Mr. McKinney and Mr. Pinter entered into an oral operating agreement; the parties only dispute the terms of that agreement. (Doc. 142 at 11; Doc. 150 at 5). Thus, summary judgment is appropriate on Mr. McKinney's unjust enrichment claim to the extent it is based on Primus's oral operating agreement.

Accordingly, the court **WILL GRANT IN PART AND DENY IN PART** the Pinter Defendants' motion for summary judgment on Count Seven. To the extent that Mr. McKinney's claim is based on the existence of a contract between VetsUSA and Primus, the court **WILL DENY** summary judgment. To the extent that his claim is based on the existence of Primus's oral operating agreement, the court **WILL GRANT** summary judgment in favor of the Pinter Defendants and against Mr. McKinney.

f.  Counts Eight and Nine: Breach of Contract

In Count Eight, Mr. McKinney alleges that VetsUSA breached a valid contract with Primus.  To prove breach of contract under Pennsylvania law,[9] the plaintiff must show: "(1) the existence of a contract, including its essential terms, (2) a breach of the duty imposed by the contract[,] and (3) resultant damages."  *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225–226 (3d Cir. 2003) (quotation marks omitted). VetsUSA disputes the existence of a legally enforceable contract between itself and Primus, arguing that the letter of intent's "plain language" indicates that it was not a final agreement.  (Doc. 141 at 17).  It also argues that its actions did not amount to breach of contract because it was entitled to cover.  (*Id.* at 14, 27).

"[I]t is a question of fact for the trier of fact to determine whether a contract exists."  *Field v. Golden Triangle Broad., Inc.*, 305 A.2d 689, 691 (Pa. 1973). Although "evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract," *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986), "it is well-settled in Pennsylvania that where the parties have settled upon the essential terms and the only remaining act to be done is the formalization of the agreement, the latter is not inconsistent with the present contract."  *Field*, 305 A.2d at 693 (Pa. 1973) (quotation marks omitted).  Conditional language does not, as a matter of law, preclude contract

---

[9] It is undisputed that Pennsylvania law governs Mr. McKinney's breach of contract claim.

formation. *Id.* (holding that a letter saying it was "[s]ubject to agreement on a formal contract" and "if a formal contract is not agreed to, [there will be no] obligation" could still be a binding contract). Instead, "when the evidence is conflicting as to whether the parties intended that a particular writing would constitute a complete expression of their agreement," summary judgment is inappropriate. *Id.* at 691.

"[T]he test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel,* 795 F.2d at 298–99 (citing *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956)). Once parties agree to essential terms with the intent to be binding, "a contract is formed even though they intend to adopt a formal document with additional terms at a later date." *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999) (quotation marks omitted). Further, "the terms and conditions of the promise must be determined through reference to those outward manifestations properly in evidence." *Mickshaw v. Coca Cola Bottling Co. of Sharon, Pa.*, 70 A.2d 467, 469 (Pa. Super. Ct. 1950).

The evidence here is in conflict, but a reasonable factfinder could conclude that an enforceable contract existed. The letter of intent expressly conditioned a contract on "reaching an agreement on terms . . . which the parties are currently negotiating." (Doc. 138-13 at 4). But it also set out definite, material terms: the unit

price per headstone, the quantity of headstones, the value of the services over five years, and the quality and specific parameters of the headstones. (Doc. 14-5 at 3–4, 7–11). Importantly, it is undisputed that the parties operated under those terms from April 2018 until August 2018. Although the letter of intent states that the parties intended to adopt a formal document with additional terms, they operated under the material terms of the letter of intent for four months. Despite the contract's conditional language, the parties' outward manifestation of the letter's material terms suggests they intended to form a contract. Accordingly, a reasonable jury could find that, based on their actions, the parties intended to be bound by those terms, regardless of the conditional language in the letter of intent. This conflict of fact precludes summary judgment.

VetsUSA's next argument, that it was entitled to cover, also fails. Mr. McKinney has produced sufficient evidence for a jury to find that VetsUSA, through the actions of Mr. Worthington, caused Primus to stop producing gravestones to satisfy its contract. Generally, when a party to a contract prevents the other party's performance, the "culpable party may not then capitalize on that failure." *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998). The evidence here shows that Mr. Worthington "was not going to move forward if [Mr. McKinney] was part of the contract." (Doc. 138-2 at 126). VetsUSA argues that there is no evidence that it would not work with Primus, only that it would no

longer work with Mr. McKinney. (Doc. 154 at 7). But it is a reasonable inference that VetsUSA's refusal to work with Mr. McKinney led Mr. Pinter to split from Primus and contributed to Primus's failure to provide gravestones. When viewed in the light most favorable to Mr. McKinney, there is a genuine issue of material fact as to whether Mr. Worthington's actions prevented Primus from satisfying its obligations under the subcontract. Accordingly, the court **WILL DENY** summary judgment on Count Eight.

VetsUSA also moves for summary judgment on Count Nine, in which Mr. McKinney pleads the alternate claim of an implied in fact contract. (Doc. 141 at 23). "A contract implied in fact is an actual contract arising when there is an agreement, but the parties intentions are inferred from their conduct in light of the circumstances." *Birchwood Lakes Cmty. Ass'n, Inc. v. Comis*, 442 A.2d 304, 308 (Pa. Super. Ct. 1982). And parties may plead "alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). The same conduct that a jury could determine created an express contract between VetsUSA and Primus also supports the existence of an implied contract. Accordingly, the court **WILL DENY** summary judgment on Count Nine.

    g.  Counts Ten and Eleven: Aiding and Abetting a Breach of Fiduciary Duty Against the VetsUSA Defendants

VetsUSA and Mr. Worthington (together "the VetsUSA Defendants") move for summary judgment on Counts Ten and Eleven. (Doc. 141 at 32). To establish a

claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." *Koken v. Steinberg*, 825 A.2d 723, 732 (Pa. Commw. Ct. 2003). The VetsUSA Defendants argue that Mr. McKinney has failed to present sufficient evidence to satisfy a jury verdict on these counts. (Doc. 143 at 33–35). Specifically, the VetsUSA Defendants make three arguments: (1) they lacked actual knowledge of Mr. Pinter's breach of fiduciary duty; (2) they did not take part in any tortious activity; and (3) they did not provide substantial assistance or encouragement to Mr. Pinter's breach of fiduciary duty. (*Id.*).

The VetsUSA Defendants first argument fails because a reasonable jury could find that Mr. Worthington knew of Mr. Pinter's fiduciary duty and of his allegedly tortious conduct. First, the undisputed evidence shows that Mr. Worthington knew that Mr. Pinter and Mr. McKinney were partners:

> Q.    You knew [Mr. McKinney and Mr. Pinter] were partners in Primus?
>
> A.    I did.

(Doc. 138-1 at 25).

> Q.    [W]hen did you know that [Primus] was owned by not only Mr. McKinney but also Mr. Pinter?
>
> . . .

> A.   Later in the spring—later in the spring Primus was formed and both of them were partners[.]

(Doc. 138-6 at 27–28).  It is reasonable to infer that Mr. Worthington, a businessman of approximately twelve years at the time of his involvement with Primus, knew that a partnership usually involves a duty of loyalty to the company and the partners.

Further, there is sufficient evidence, when viewed in the light most favorable to Mr. McKinney, to find that the VetsUSA Defendants encouraged Mr. Pinter to split with Mr. McKinney and fulfill the contract through Pinter Memorials. Mr. Pinter told Mr. Worthington before JB Processing banned Mr. McKinney that Mr. Pinter was "going to try and keep operating" through "Pinter Memorials which [he] had still been operating and try and keep fulfilling the contract."  (Doc. 138-3 at 6).  The next day, Stephanie Worthington asked Mr. Pinter whether she could call the VA to tell them about the change in the subcontract.  (Doc. 138-6 at 4–5).  In a text message to Mr. Swindal, Mr. Pinter wrote that "[t]he only way [Mr.] Worthington wants to move forward with [JB Processing is if [Mr.] McKinney is banned from the property."  (Doc. 138-4 at 82).

Also, after Primus stopped producing gravestones, VetsUSA immediately began purchasing them from Pinter Memorials, with a VetsUSA employee communicating with Mr. Pinter about his marble purchases.  (Doc. 149-2 at 33).  It is reasonable to infer from this evidence that the VetsUSA Defendants knew of Mr. Pinter's plan to split with Mr. McKinney and provided him with the support and

encouragement he needed to do so.  Accordingly, the court **WILL DENY** summary judgment on Counts Ten and Eleven.

   h.   Count Twelve: Aiding and Abetting Breach of Fiduciary Duty Against the
        Pinter Defendants

The Pinter Defendants move for summary judgment on Count Twelve, Mr. McKinney's claim for aiding and abetting a breach of fiduciary duty.  (Doc. 143 at 26).  As an initial matter, Mr. McKinney has withdrawn his claim against Mr. Pinter on this count.  (Doc. 150 at 27).  Accordingly, the court **WILL GRANT** Mr. Pinter's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Pinter and against Mr. McKinney on this count.

The only argument that Pinter Memorials makes for summary judgment on Count Twelve is that it cannot be a third party because it can only act through its agent, Mr. Pinter.  (Doc. 143 at 26–27; Doc. 152 at 8–9).  It does not, however, cite any authority establishing that a company cannot be a third party for purposes of aiding and abetting a breach of fiduciary duty where its officer is the one that owes the duty.  (Doc. 150 at 28).  Mr. McKinney's claim here is that Pinter Memorials aided and abetted in Mr. Pinter's breach by standing "ready to manufacture gravestones in Primus's place."  (Doc. 150 at 28).  Pinter Memorials, despite being a legal entity, is still a third party to the alleged breach.  It is undisputed that if a fiduciary duty existed, it was not Pinter Memorials' duty.  As the movant, it is Pinter Memorials' burden to show that it is entitled to judgment as a matter of law.  Fed.

R. of Civ. P. 56(a).  It has not done so here.  Accordingly, the court **WILL DENY** Pinter Memorials' motion for summary judgment on Count Twelve.

> i.   Counts Thirteen and Fourteen: Violations of PUTSA and DTSA

In Counts Thirteen and Fourteen, Mr. McKinney alleges violations of the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and the Defend Trade Secrets Act.  (Doc. 14 at 41–42).  Mr. McKinney has withdrawn Counts Thirteen and Fourteen.  (Doc. 150 at 35).  Accordingly, the court **WILL GRANT** the Pinter Defendants' summary judgment motion on Count Thirteen and Count Fourteen and **WILL ENTER SUMMARY JUDGMENT** in favor of the Pinter Defendants and against Mr. McKinney on those counts.

> j.   Count Fifteen: Unfair Competition

In Count Fifteen, Mr. McKinney alleges unfair competition against Mr. Worthington, VetsUSA, and Pinter Memorials.  (Doc. 14 at 43–44).  At the motion to dismiss stage, the court found that Mr. McKinney stated a claim for unfair competition because, under Pennsylvania law, "a claim for tortious interference . . . appears to support an alternative claim for unfair competition." (Doc. 86 at 13); *see also ID Security Systems Canada, Inc. v. Checkpoinot Systems, Inc.*, 249 F. Supp. 2d 622, 688 (E.D. Pa. 2003) (finding that "means of competition [that] are otherwise tortious" support a claim for unfair competition).  As discussed *supra*, Mr. McKinney's tortious interference claim survives summary judgment

against VetsUSA and Pinter Memorials. Accordingly, his unfair competition claim also survives, and the court **WILL DENY** summary judgment on Count Fifteen against VetsUSA and Pinter Memorials.

The court dismissed Mr. McKinney's tortious interference claim against Mr. Worthington, however, and thus Mr. McKinney's unfair competition claim cannot rely on that independent tort. Mr. McKinney testified that he told "every Vets[USA] employee" that the fabrication process "was going to be and that it was, in fact, confidential." (Doc. 138-2 at 25, 1–5). But Mr. McKinney has not pointed to any evidence that Mr. Worthington misappropriated confidential information or that Mr. Pinter used confidential information for Mr. Worthington's benefit, as opposed to the benefit of Pinter Memorials and VetsUSA. Instead, there is some evidence Pinter Memorials used a different fabrication process than Primus. (Doc. 138-6 at 9). Regardless, Mr. McKinney has not presented evidence supporting an unfair competition claim against Mr. Worthington. Therefore, the court **WILL GRANT** Mr. Worthington's motion and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Worthington on Count Fifteen  and against Mr. McKinney on that count.

### k.  Count Sixteen: Breach of Fee-Splitting Contract

Pinter Memorials moves for summary judgment on Count Sixteen, Mr. McKinney's claim for breach of a fee-splitting contract. (Doc. 143 at 29). Pinter

Memorials argues that because "VetsUSA decided to do the engraving itself rather than have Pinter Memorials do it," Pinter Memorials collected no fees that it could have split with Primus.  (*Id.*; Doc. 138-6 at 15).  Mr. McKinney does not respond to this argument.  Accordingly, the court **WILL GRANT** Pinter Memorial's motion for summary judgment on Count Sixteen and **WILL ENTER SUMMARY JUDGMENT** in favor of Pinter Memorials and against Mr. McKinney on this count.

l.   Derivative and Individual Claims

Mr. Pinter moves for summary judgment on all of Mr. McKinney's derivative claims, arguing that Mr. McKinney has not met the burden of showing demand futility.  (Doc. 143 at 44–45).  To bring a derivative suit, a member of an LLC must show that the "members with authority [to bring a derivative suit] have refused to bring the action" or that any effort to cause them to bring the action would be futile. 6 Del. C. § 18-1001.  But in an evenly divided LLC, "it may be inferred that the [b]oard is incapable of exercising its power and authority to pursue the derivative claims directly." *Beneville v. York*, 769 A.2d 80, 86 (Del. Ch. 2000).

Here, it is undisputed that Mr. Pinter and Mr. McKinney are the only members of Primus.  Accordingly, it would be futile for Mr. McKinney to seek board approval for a derivative suit against Mr. Pinter and the court **WILL DENY** summary judgment on this claim.

48

The Pinter Defendants also move for summary judgment on any claim that Mr. McKinney brings in both his individual and derivative capacity, arguing that any "damages would belong solely to Primus." (Doc. 143 at 45–46). The only remaining counts that Mr. McKinney brings against the Pinter Defendants in both his individual and derivative capacity are Count One and Count Twelve. (Doc. 14 at 19, 40). These counts involve the alleged breach of Mr. Pinter's fiduciary duty, a duty he owed both to Primus and to Mr. McKinney. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 n.1 (Del. Ch. 2012). Thus, a breach of these duties can create both individual and derivative liability. Accordingly, the court **WILL DENY** summary judgment on this claim.

m. Counterclaims One and Two: Breach of Fiduciary Duties

Mr. McKinney moves for partial summary judgment on Counterclaims One and Two,[10] arguing that the business judgment rule shields him from liability. (Doc. 142 at 17). Under Delaware law,[11] the standard of review for breaches of fiduciary duty depend on whether the member was disinterested and independent or faced a potential conflict of interest. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del.

---

[10] Mr. McKinney does not move for summary judgment to the extent that these counterclaims are based on his alleged failure to contribute capital to Primus. (Doc. 142 at 17 n.3). A reasonable interpretation of the answer and counterclaim is that Mr. Pinter and Pinter Memorials allege that Mr. McKinney breached his fiduciary duties by failing to contribute capital. (Doc. 39 at 34–36). Their response confirms this, arguing that Mr. McKinney's alleged "abdication of his responsibility to finance the project . . . amounted to a breach of fiduciary duty." (Doc. 148 at 26).

[11] It is undisputed that, according to the internal affairs doctrine, Delaware law applies to Counterclaims One and Two.

Ch. 2013).  For alleged breaches by a disinterested and independent member, the court applies the business judgment rule and "merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."  *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.").

Here, Mr. Pinter does not argue that Mr. McKinney was faced with a conflict of interests.   (Doc. 148 at 24).   Instead, he argues that Mr. McKinney's "unacceptable behavior, including his verbal abuse . . . ruined any chance Primus had of success."  (Doc. 148 at 26).   Mr. Swindal testified that Mr. McKinney "created a toxic environment," that his conduct was "unpredictable," and that Mr. McKinney was "difficult to work with."  (Doc. 140-5 at 70, 72).  Mr. McKinney also sent a text to Ms. Catron that said he was "[r]eady to kick someone's ass."  (Doc. 147-3 at 3).

But even when viewed in the light most favorable to the non-movants, the evidence here does not rebut the business judgment rule.   Mr. McKinney acknowledged that he "r[an] everything with an iron fist."  (Doc. 140-14 at 5).  In his opinion, this had the result that "everyone might not like [him], but they will

50

respect [him]." (*Id.*).  The result of his actions, whether they led to respect or to a toxic environment, is irrelevant.  Even if Mr. McKinney's actions were misguided and ineffective, the court "will not substitute its own notions of what is or is not sound business judgment." *Sinclair Oil Corp.*, 280 A.2d at 720.

The business judgment rule is often determinative. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989).  Because Mr. Pinter does not address the business judgment rule in his response, and has not offered evidence to rebut its presumption, it is determinative here.  Accordingly, the court **WILL GRANT** Mr. McKinney's motion for partial summary judgment on Counterclaims One and Two and **WILL ENTER PARTIAL SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter and Pinter Memorials on those counterclaims.

### n.  Counterclaim Three: Breach of the Operating Agreement

Mr. Pinter alleges that Mr. McKinney breached the terms of Primus's oral operating agreement.  (Doc. 39 at 41–42).  In his counterclaim, Mr. Pinter asserts that the parties agreed to an oral operating agreement that included the following provisions:

> c.  [Mr. Pinter and Mr. McKinney] would treat Primus' employees with respect and integrity;

> d.  [Mr. Pinter and Mr. McKinney] would treat Primus' customers with respect and integrity;

    e.      [Mr. Pinter and Mr. McKinney] would treat Primus' customers with respect and integrity;

. . .

    i.      If either Pinter or McKinney failed to satisfy (a) through (h) above, then the non-breaching party could resign from Primus, and Primus would be dissolved.

(Doc. 39 at 35).

Mr. McKinney moves for partial summary judgment on this count "to the extent that Count Three rests on alleged breaches pertaining to paragraphs (c), (d), and (e) of Mr. Pinter's version of the Oral Operating Agreement," and to the extent that "Count Three rests on invoking [paragraph (i)]." (Doc. 142 at 24, 27–28).

Mr. McKinney makes three arguments for summary judgment: first, that the undisputed evidence shows that the parties did not agree to paragraphs (c), (d), and (e) of Mr. Pinter's alleged operating agreement (doc. 142 at 23–24); second, that the terms "respect" and "integrity" contained in those paragraphs are unenforceable because they are "incapable of fixed, objective, and ascertainable measurement" (*id.* at 25); and third, that the parties never agreed to paragraph (i) and that Mr. McKinney's alleged failure to contribute capital to Primus did not allow Mr. Pinter to dissolve the corporation (*id.* at 27).

Mr. McKinney's first argument fails because there is sufficient evidence for a reasonable jury to conclude that the operating agreement included the respect and integrity provision. "Under Delaware law, contract formation is a question of

fact."[12] *Sheets v. Quality Assured, Inc.*, No. N14C-03-010 VLM, 2014 WL 4941983, at *2 (Del. Super. Ct. Sept. 30, 2014) (citing *Universal Products Co. v. Emerson*, 179 A. 387 (Del.1935)).   An LLC's operating agreement can be "written, oral or implied."   Del. Code Ann. tit. 6, § 18-101(9).   Here, the evidence shows that Mr. Pinter thought that he and Mr. McKinney had entered into an oral operating agreement with a term requiring that they "treat [their] employees with respect and integrity."   (Doc. 138-3 at 70–71).   Whether there was a meeting of the minds between the two men is a question for the jury.

Mr. McKinney's second argument is similarly unsuccessful.   Although the terms "respect" and "integrity" are somewhat vague, Mr. McKinney has not shown that they are unenforceable under Delaware or Alabama law.   The cases cited by Mr. McKinney address terms that were left out of a contract entirely, not general terms left undefined.   *See Ramone v. Lang*, No. Civ.A. 1592-N, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006) (finding that material terms were left unsettled including "whether capital expenditures would be paid by the owners or the tenant, [and] the particulars of the buyout option"); *White Sands Grp., L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1052 (Ala. 2008) (finding that the parties left out the price in a land contract and no parties agreed to perform any of the contracts essential terms);

---

[12] Both parties cite to Delaware law, although Mr. McKinney also cites to Alabama law. (Doc. 142 at 24; Doc. 148 at 27).   There does not appear to be a conflict of law on this issue.

*Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC*, 615 F. Supp. 2d 1296, 1302 (S.D. Ala. 2009) (finding that a contract was indefinite where it did not provide for "a firm price and neither party shows how a firm price was, or could be, ascertained").  The only case that Mr. McKinney cites addressing the vagueness of a term included in the contract is one in which the parties agreed to "meet together as necessary."  *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, No. Civ.A. 3099-VCN, 2009 WL 264088, at *5 (Del. Ch. Feb. 3, 2009) (quotation marks omitted).  But in that case, the court held that "a rough skeleton of definite obligations exists in the [contract] upon which prior course of dealings and industry custom could, by reasonable inference, add sufficient flesh to justify enforcement . . . ."  *Id.*

Other Delaware cases address the terms "integrity" and "respect," although in other contexts.  *See Zucker v. Andreessen*, No. Civ.A. 6014-VCP, 2012 WL 2366448, at *3 (Del. Ch. June 21, 2012) (finding that, on a motion to dismiss, a failure to "live up to HP's standards and principles of trust, respect and integrity, . . . constitutes a ground to terminate an executive officer for Cause.") (alterations accepted) (citations and quotation marks omitted); *Patterson v. Dep't of Health*, No. CV N16A-07-004 AML, 2017 WL 4570819, at *2 (Del. Super. Ct. Oct. 13, 2017) (affirming an agency termination decision based, in part, on failure to "conduct the State of Delaware's Business with integrity, respect and prudent judgment").

Further, courts "will give disputed terms their ordinary and usual meaning." *Smartmatic Int'l Corp. v. Dominion Voting Sys. Int'l Corp.*, No. CIV.A. 7844-VCP, 2013 WL 1821608, at *4 (Del. Ch. May 1, 2013); *see also Respect*, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/respect (last visited Feb. 5, 2021); *Integrity*, *Black's Law Dictionary* (11th ed. 2019). If a jury finds that the parties agreed to the respect and integrity provisions, those provisions are sufficiently definite for a jury to decide whether Mr. McKinney complied with their terms.

Finally, Mr. McKinney's third argument fails because paragraph (i) of the alleged operating agreement cannot be breached. (Doc. 142 at 6). Counterclaim Three is for breach of the operating agreement. (Doc. 39 at 41–42). But paragraph (i) does not impose a duty on either party. Instead, it describes what happens if a partner breaches the operating agreement. Nothing in Counterclaim Three can be reasonably interpreted as alleging a breach of paragraph (i).[13] Accordingly, the court **WILL DENY** summary judgment on Counterclaim Three.

o.  Counterclaim Four

Counterclaim Four is for unjust enrichment. (Doc. 39 at 42). Mr. McKinney argues that summary judgment is appropriate on this claim because the unjust

---

[13] Mr. Pinter appears to rely on this provision in his third affirmative defense, but Mr. McKinney has not moved for summary judgment on any affirmative defenses. (Doc. 39 at 32).

enrichment claim is barred by the existence of the oral operating agreement.  (Doc. 142 at 28).  "[W]here an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter." *Kennedy*, 682 So. 2d at 447.[14]  Although courts will allow an unjust enrichment claim to be pled in the alternative, they will do so only when "the existence of an express contract . . . [is] disputed and remains a question of fact." *Id.*  Where only the terms of the contract are in dispute, the court will not allow the unjust enrichment claim to proceed.  *Id. see also Vardaman v. Florence City Bd. of Educ.*, 544 So. 2d 962, 964–65 (Ala. 1989) (holding that the court properly granted summary judgment on an implied contract claim where only the terms of the express contract were in dispute).

Here, it is undisputed that the parties entered into an oral operating agreement.[15]  The only factual dispute involves the terms of the agreement and whether Mr. McKinney met his obligation to contribute fifty percent of Primus's capital requirements.  (Doc. 142 at 9–11; Doc. 148 at 8–9).  Thus, although Mr. Pinter pleads unjust enrichment as an alternate claim to breach of contract, his

---

[14] The parties do not agree which law applies to this claim, but it appears that there is no conflict of laws.  *See, e.g. Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999); *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969).  Because both parties cite to Alabama law, the court will analyze the issue according to Alabama law. (Doc. 142 at 29–30; Doc. 148 at 30).

[15] Mr. Pinter argues that the existence of the contract is put at issue by his counterclaim for fraudulent inducement.  (Doc. 148 at 30).  As discussed in part p, *infra*, Mr. Pinter's fraudulent inducement claim cannot survive summary judgment and thus does not undermine the existence of the operating agreement.

claim cannot survive summary judgment.  Accordingly, the court **WILL GRANT** summary judgment on Counterclaim Four and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on this counterclaim.

p.  Counterclaim Five: Fraudulent Inducement

Mr. McKinney moves for summary judgment on Counterclaim Five, arguing that Mr. Pinter has presented insufficient evidence of promissory fraud.  (Doc. 142 at 33).  To prevail on a promissory fraud claim, the plaintiff must present "proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and . . . proof that the defendant had an intent to deceive." *Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1210 (Ala. 2008) (quoting *Michelin North America*, 795 So.2d 674, 678–79 (Ala. 2001)).[16]  "The plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept; otherwise, any breach of contract would constitute a fraud." *Goodyear Tire & Rubber Co. v. Washington*, 719 So. 2d 774, 776 (Ala. 1998). "Evidence of consistent, but unfulfilled, promises can in some cases amount to substantial evidence of an intent to deceive."  *Southland Bank*, 21 So. 3d at 1212.

---

[16] The parties do not agree whether Delaware or Alabama law applies.  Because promissory fraud is a tort claim, the court will apply the law of the place of the alleged injury, Alabama, to the extent that the law conflicts.  *Lifestar Response of Alabama, Inc. v. Admiral Ins. Co.*, 17 So. 3d 200, 213 (Ala. 2009); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that a federal court should apply the conflict of law principles of the state in which it sits).

And "[w]here the plaintiff presents substantial evidence that the defendant had an intent to deceive, it is for the jury to decide whether the defendant actually had such an intent." *Murphy v. Droke*, 668 So. 2d 513, 517 (Ala. 1995).

Here, there is insufficient evidence of fraudulent intent to survive summary judgment. Mr. Pinter points to two pieces of evidence: (1) Mr. McKinney's representation to Mr. Pinter that he had substantial assets and would contribute fifty percent of the capital required to operate Primus, and (2) Mr. McKinney's representation to the owners of JB Processing about the financial status of Primus.[17] Mr. McKinney's representation to Mr. Pinter is insufficient on its own to support a promissory fraud claim.[18] Mr. Pinter has not pointed to any evidence that Mr. McKinney did not have the assets that he claimed, only that he eventually did not satisfy his promise.

Mr. Pinter also argues that Mr. McKinney made "misrepresentations to the owners of JB Processing, including misrepresentations about the financial status of

---

[17] In his argument section, Mr. Pinter does not cite to evidence in the record of either of these two pieces of evidence. The court assumes that Mr. McKinney's citation to an email sent by Mr. McKinney to Wei Goa is accurate on this point. (Doc. 155 at 10; Doc. 138-2 at 283–85).

[18] Mr. Pinter does not point to any evidence in his argument section that supports his claim that Mr. McKinney was intentionally lying when he agreed to the fifty percent capital contribution. He does, however, cite to evidence in his response to the statement of undisputed facts (doc. 148 at 9), but this evidence is Mr. Pinter's own affidavit that he believed "that McKinney's representation that he would contribute 50% of the capital required to operate Primus was false." (Doc. 147-1 at 3). Mr. Pinter's speculation that Mr. McKinney was lying is insufficient to create a genuine issue of fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").

Primus." (Doc. 148 at 33). Mr. Pinter argues that this is circumstantial evidence that Mr. McKinney habitually misleads prospective business partners to induce them into business relationships. (*Id.*). But in his argument, Mr. Pinter does not point the court to any evidence supporting this claim. Presumably, Mr. Pinter is referring to an email that Mr. McKinney sent to Wei Gao in which he made various allegedly inaccurate claims regarding Primus's future business prospects. (*See* Doc. 140-14 at 5–7).

First, the extent to which the email was inaccurate is disputed. Mr. Worthington's testimony regarding the value of the contract to Primus supports Mr. McKinney's financial assertions in his email to Mr. Gao. Mr. Worthington testified that if the relationship between VetsUSA and Primus had continued, there was a potential for up to "100 million [dollars] of future receivables." (Doc. 138-1 at 83). Mr. McKinney wrote that a thirty-three percent stake in Primus could be worth "over $600,000 of actual return investment" over the next twelve months. (Doc. 140-14 at 7). He also wrote that in addition to the contract that Primus already had with VetsUSA, the company would be "awarded over $185,000,000 in contracts over the next three years." (*Id.* at 5). Mr. McKinney admitted that some of the information in the email to Mr. Goa was inaccurate, but he testified that he corrected the information in person. (Doc. 138-2 at 78). He also said that "[a]t the time, [he] felt that that was very accurate." (*Id.*).

Second, even if the numbers in the email were wrong, the email does not constitute "[e]vidence of consistent, but unfulfilled, promises." *Southland Bank*, 21 So. 3d at 1212. Whether considered alone or with Mr. McKinney's promise to contribute capital to Primus, the email does not present "substantial evidence that the defendant had an intent to deceive." *Murphy*, 668 So. 2d at 517. In short, even when viewed in the light most favorable to Mr. Pinter, there is insufficient evidence for a jury to find that Mr. McKinney fraudulently induced Mr. Pinter into joining the operating agreement. Accordingly, the court **WILL GRANT** summary judgment on Counterclaim Five and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on this counterclaim.

## IV. CONCLUSION

The court **WILL GRANT IN PART** and **DENY IN PART** Mr. Worthington and VetsUSA's motion for summary judgment. (Doc. 138). The court **WILL GRANT** summary judgment in favor of Mr. Worthington on Count Fifteen and will **ENTER SUMMARY JUDGMENT** in favor of Mr. Worthington and against Mr. McKinney on that count. The court **WILL DENY** Mr. Worthington's motion for summary judgment on Count Ten. The court **WILL DENY** VetsUSA's motion

for summary judgment on Count Four, Count Eight, Count Nine, Count Eleven, and Count Fifteen.

Further, the court **WILL GRANT IN PART** and **DENY IN PART** Mr. Pinter and Pinter Memorials' motion for summary judgment. (Doc. 140). The court **WILL GRANT** summary judgment in favor of Mr. Pinter on Count Twelve, Count Thirteen, Count Fourteen, and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. Pinter and against Mr. McKinney on those counts. The court **WILL GRANT** summary judgment in favor of Pinter Memorials on Count Thirteen, Count Fourteen, and Count Sixteen and **WILL ENTER SUMMARY JUDGMENT** in favor of Pinter Memorials and against Mr. McKinney on those counts. The court **WILL GRANT PARTIAL SUMMARY JUDGMENT** in favor of the Mr. Pinter and Pinter Memorials on Count Seven and **ENTER PARTIAL SUMMARY JUDGMENT** in their favor and against Mr. McKinney on that count. The court **WILL DENY** Mr. Pinter's motion for summary judgment on Count One, Count Two, Count Three, Count Five, and Count Six. The court **WILL DENY** Pinter Memorials' motion for summary judgment on Count Three, Count Four, Count Twelve, and Count Fifteen.

Finally, the court **WILL GRANT IN PART** and **DENY IN PART** Mr. McKinney's motion for partial summary judgment. (Doc. 139). The court **WILL GRANT** Mr. McKinney's motion for partial summary judgment on

Counterclaim One and Counterclaim Two and **WILL ENTER PARTIAL SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on those counts. The court **WILL DENY** partial summary judgment on Counterclaim Three. The court **WILL GRANT** Mr. McKinney's motion for summary judgment on Counterclaim Four and Counterclaim Five and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. McKinney and against Mr. Pinter on those counts.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this March 18, 2021.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE